IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| PEDRO CHAIREZ, | ) | |
| Y35814, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 25-cv-62-DWD |
| MARCELLUS OTTENSMEIER, | ) | |
| KEVIN REICHERT, | ) | |
| LUKAS BOHNERT, | ) | |
| JOSHUA SCHOENBECK, | ) | |
| DIANE ARMSTRONG, | ) | |
| LT. LOURE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM & ORDER

**DUGAN, District Judge:**

Plaintiff Pedro Chairez, an inmate of the Illinois Department of Corrections (IDOC) currently detained at Menard Correctional Center (Menard), brings this civil rights action pursuant to 42 U.S.C. § 1983 for alleged deprivations of his constitutional rights. (Doc. 1). Plaintiff alleges that starting in September of 2023 officials at Menard began to retaliate against him for lodging internal and external complaints about his conditions of confinement. At present, he alleges the retaliation has culminated in his placement in administrative detention, and a permanent ban on his ability to communicate with his wife. He seeks numerous forms of injunctive relief, including some immediate measures.

The Complaint (Doc. 1) is now before the Court for preliminary review pursuant to 28 U.S.C. § 1915A. Under Section 1915A, the Court is required to screen prisoner complaints to filter out non-meritorious claims. *See* 28 U.S.C. § 1915A(a)-(b). Any portion of a complaint that is legally frivolous, malicious, fails to state a claim upon which relief may be granted, or asks for money damages from a defendant who by law is immune from such relief must be dismissed. 28 U.S.C. § 1915A(b). At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

## THE COMPLAINT

Plaintiff is housed at Menard on behalf of the Arizona Department of Corrections (ADC). (Doc. 1 at 22). Around September 1, 2023, he asked his mother to contact the ADC about his conditions of confinement at Menard, including excessive heat, poor air circulation, and the lack of yard time. The ADC informed his mother that they had contacted the Warden at Menard, who denied the allegations. On September 8, 2023, Plaintiff wrote Defendant Reichert, Menard's assistant warden of operations, about the same conditions as well as a commissary shortage.

On September 21, 2023, Plaintiff alleges that three officers abruptly escorted him to segregation under the guise of an investigation. Plaintiff alleges this was the start of ongoing retaliation by Defendants Ottensmeier, Bohnert and Reichert. (Doc. 1 at 22). During the investigation, Plaintiff alleges he was without his hygiene supplies or clothing for over three weeks. (Doc. 1 at 23). In mid-October 2023, Defendant Ottensmeier came to his cell to perform a shakedown. Plaintiff asked why Ottensmeier was going to

conduct a shakedown after Plaintiff's cell had already been searched numerous times, to which Ottensmeier made a remark about seeing if Plaintiff's living conditions had improved. (Doc. 1 at 23).

On October 17, 2023, Plaintiff received a disciplinary ticket for possessing "gang material" and a dangerous weapon. He claims the ticket was premised on his possession of a miniature screwdriver, which staff would typically throw away. He also alleges if a ticket was warranted, at most the ticket should have been for contraband, rather than "dangerous" contraband. Additionally, Plaintiff was charged with and found guilty of possessing a pamphlet for a pharmacy technician certification exam, which he alleges he had to help his wife study for an exam. This pamphlet was characterized as drug paraphernalia. Plaintiff alleges that after receiving these tickets and based on Ottensmeier's comment about his conditions of confinement, he then realized that he was being singled-out for complaining about the conditions. (Doc. 1 at 23).

From October of 2023 through December of 2024, Plaintiff faults Defendant Ottensmeier for intentionally destroying or disposing of letters from his wife, or substantially delaying their delivery. (Doc. 1 at 24). Ottensmeier has access to do this because he is the sole party responsible for reviewing mail to administrative detention inmates. Around the same time, he claims he filed three grievances (one dealing with his October 2023 disciplinary tickets), but one of the three went missing. Plaintiff concluded that his discipline was coordinated at the hands of a small group of prison employees who act with impunity, which made him concerned about lodging further grievances or complaints. (Doc. 1 at 24). Plaintiff resigned to stop complaining, but in early December

of 2023, his wife persuaded him to resume his efforts.  Plaintiff instructed her to contact Menard's Warden and IDOC's Director.  (Doc. 1 at 24).

On December 18, 2023, Defendant Ottensmeier arrived at Plaintiff's cell and gave him an administrative detention placement notice he had prepared with the assistance of Defendant Bohnert.  (Doc. 1 at 24-25).  Plaintiff asked why he was being given the notice, and Ottensmeier said, "you mess with us, we mess with you."  (Doc. 1 at 25).  The next day Plaintiff received a disciplinary ticket for distributing drugs.  Plaintiff claims this new ticket came just two days before his scheduled release from segregation for the tickets relating to the screwdriver and drug pamphlet.  He alleges that the December 20, 2023, administrative detention hearing and the December 22, 2023, disciplinary hearing on the new ticket were both "shams."  (Doc. 1 at 25).  These sanctions led to a flurry of grievance activity, and Plaintiff claims that in the mix he somehow lost privileges to communicate with his wife, though that was not a disciplinary sanction listed on the ticket or administrative detention notice.

Plaintiff alleges that in February of 2024 he sent a complaint to a case manager of his, but it never arrived.  Around the same time Defendant Ottensmeier stopped by his cell and told him to stop what he was doing before he "loses it all."  (Doc. 1 at 26).  In April of 2024, Plaintiff submitted two separate grievance appeals to the Administrative Review Board (ARB), but he alleges Ottensmeier intercepted them, held them for 90 days, and then falsely returned them for lacking postage after it was too late for him to appeal.  (Doc. 1 at 26).  In late April 2024, Plaintiff either directly contacted or asked his wife to contact outside entities on his behalf.

On May 3, 2024, Defendant Reichert notified Plaintiff's wife she was permanently banned from in-person visits and video visits. The reason given was an ongoing internal affairs investigation. On May 4, 2024, Defendants Ottensmeier and Bohnert blocked email traffic between Plaintiff and his wife, and also removed her from Plaintiff's approved contacts phone list. (Doc. 1 at 26). Plaintiff alleges he and his wife never broke rules, and the restrictions were retaliation for his grievances and complaints.

In August of 2024, Plaintiff stopped Defendant Reichert during a gallery tour, and they had a verbal exchange wherein Reichert indicated Plaintiff harassed his staff, and implied that the restrictions related to Plaintiff's wife were tied to that issue. (Doc. 1 at 27). On October 1, 2024, Plaintiff submitted a statement for his administrative detention review hearing wherein he was critical of internal affairs. He alleges that within a few hours Defendant Ottensmeier denied 13 emails from his mother, which he characterizes as retaliation. (Doc. 1 at 27). Plaintiff alleges this experience made him fearful about submitting future statements for administrative detention review hearings.

Plaintiff goes on to identify five counts related to his factual assertions, and he supports each count with a memorandum of law citing relevant cases that he believes bolster his position. (Doc. 1 at 28-50). The Court will not recite the legal assertions, but it will briefly summarize any additional factual assertions Plaintiff included in this section. In Count 1, Plaintiff alleges that he has been retaliated against for filing grievances, complaints, and a written statement for his administrative detention review hearing. The facts are essentially the same as the factual assertions already described above in relation to Ottensmeier, Bohnert and Reichert.

In Count 2, Plaintiff alleges his Due Process rights have been violated by his placement in administrative detention. Specifically, he claims the statement in the initial placement notice was rife with "disinformation" and vague statements. (Doc. 1 at 30). Of note, he faults Ottensmeier and Bohnert for including inaccurate information about his past involvement in a prison riot that led to the death of a correctional officer. He claims he was never disciplined or criminally convicted for this incident, and he includes evidence that he was ultimately not charged in relation with the incident. He claims this information was included despite its inaccuracy because the Illinois Administrative Code requires evidence of violence to sustain an administrative detention placement.[1] (Doc. 1 at 30). Plaintiff further argues he has attended four of his last five administrative detention review hearings and has been entirely unable to ascertain the real reason for his placement. He also has been unsuccessful challenging information that he believes was incorrect in the initial report, and he faults Defendants Armstrong and Loure for failing to give him discrete action items to improve his chances of release. He claims the hearings are shams and that the outcomes are predetermined. (Doc. 1 at 31). He alleges he has been unreasonably singled out for his placement, and that among IDOC's administrative detention population he is an anomaly given that there is no violent basis for his placement. He describes the conditions as total isolation behind a closed metal door, with recreation only allowed twice a month depending on staffing levels. He often

---

[1] Despite his assertion that a finding of violence is needed, he included an excerpt of the Administrative Code that clearly states administrative detention can be used for inmates who are "violent, disruptive, predatory or other serious misbehavior poses a serious threat to other inmates, staff, or the orderly operation of the institution." (Doc. 1 at 30), citing Ill. Admin. Code A.D. 05.12.101.

goes for 8-12 days without leaving his cell even for a shower, and he has been in these conditions for more than a year at this point. (Doc. 1 at 32). Plaintiff has attempted to grieve his situation, to no avail. (Doc. 1 at 33).

In Count 3, Plaintiff alleges his December 2023 disciplinary hearing lacked adequate due process protections. He challenges the reliability of the disciplinary report, which purported to be based upon information from three confidential informants, and claims when he asked Defendant Schoenbeck about the informants at his hearing that Schoenbeck did not know anything about their statements. (Doc. 1 at 37). He claims that his procedural due process rights were violated because the confidential informants' credibility was not verified in any way prior to their vague statements being used at his disciplinary hearing. He argues that as a result of the discipline, he is now stuck in indefinite administrative segregation. He further argues that his hearing was unfair because Menard has an unofficial policy of placing a minority member on the disciplinary committee who does not substantively participate. (Doc. 1 at 39).

In Count 4, Plaintiff alleges his First Amendment rights have been violated by the interception of countless incoming and outgoing letters exchanged with his wife. (Doc. 1 at 44). He faults Defendant Ottensmeier for being personally responsible for screening and intercepting significant mail from October of 2023 through May of 2024. He also indicates he presented concerns about his mail problems to Defendant Reichert and another prison official but got no assistance. In January of 2024, Plaintiff was notified that his mail would be scanned for 90 days before timely delivery, but after that notice he claims he received zero mail. On May 3, 2024, when Defendants Reichert, Bohnert and

Ottensmeier banned visits and email communications between Plaintiff and his wife, physical mail became their only means of communication. Despite their numerous efforts to communicate in this fashion, Plaintiff claims he did not regularly receive her correspondence until December of 2024. (Doc. 1 at 45). During the same timeframe, he has also received at least 43 rejection notices for his mail for vague reasons. Plaintiff claims that the mail interference is retaliatory. (Doc. 1 at 46).

In Count 5, Plaintiff alleges that the permanent ban on most communication and visits with his wife violates either his First, Eighth or Fourteenth Amendment substantive due process rights. (Doc. 1 at 47). In the lead-up to his wife being banned, Plaintiff alleges he was actively lodging challenges about issues at Menard at all levels from the Director of IDOC to outside entities. When Defendants Bohnert and Ottensmeier issued the ban, Plaintiff claims their sole reason was the vague assertion that an ongoing internal affairs investigation was the cause for the ban. (Doc. 1 at 47). He claims his ban violates 730 ILCS 5/3-7-2, a provision that provides for in-person and video visits for inmates subject to an abuse of the privilege or a determination by the CAO that visits would be dangerous to the security, safety, or morale of the institution. (Doc. 1 at 47). Plaintiff has complained to Defendant Reichert about the ban, and he and his wife applied to restore privileges in November of 2024, but Reichert denied the request with no rationale. (Doc. 1 at 49). Plaintiff argues that although there can be permissible communication bans, the ban he has is so far-reaching it is not proper. (Doc. 1 at 50).

Plaintiff seeks monetary compensation, a declaratory judgment, and various forms of injunctive relief. Specifically, he seeks an injunction to: stop mail interference, reinstate

visiting rights with his wife, unblock his wife from his prison tablet, remove his wife from his restricted phone list, stop harassment and retaliation, transfer him to another facility, remove him from administrative detention, and expunge his disciplinary ticket.  (Doc. 1 at 51-52).

In support of the complaint, Plaintiff submitted exhibits including his December 2023 disciplinary ticket, his administrative detention placement notice, various follow-up hearing documents, grievances, the notice of his visitation ban, declarations from other inmates, and more.  The Administrative Detention Notice explained that Plaintiff was received by IDOC "following his involvement in a Delaware prison riot and hostage situation that resulted in the murder of a correctional lieutenant."  (Doc. 1 at 59).  It went on to explain that while incarcerated in Delaware (and earlier in the Arizona Department of Corrections) Plaintiff was disciplined for dangerous contraband, assault, abuse of privileges, gang activity and money laundering, among other things.  The notice also stated that since arriving in IDOC in 2019, Plaintiff has been identified as associating with a gang.  It explained,

> Since being housed at Menard C.C., Chairez has been identified by multiple confidential sources as introducing Methamphetamine and other narcotics into the institution.  Approximately 44 grams of Methamphetamine recovered by security staff in 2023 have tied back to Chairez.  On 9/21/2023 during a search of Chairez's assigned cell, staff discovered a homemade screwdriver capable of removing the hollowed-out coat rack found in the cell, a laminated pamphlet which determined the chemical breakdown of prescription pills along with a key for coded messages to identify multiple types of drugs, cell phones/chargers, monetary amounts, what type of mail was being sent and different cell phone providers.  Staff also discovered in Chairez's property box multiple hard back book covers which had been removed from the books and appeared to have been peeled apart as if to remove something that had been concealed in the book covers.  It should

be noted that all 44 grams of Methamphetamine recovered tying back to Chairez were found either concealed inside of an altered box or hard back book book binding similarly to the altered books recovered in Chairez assigned cell.

(Doc. 1 at 59).

In the December 19, 2023, disciplinary report, the reporting employee alleged,

The investigation was being conducted in an attempt to identify individuals in custody who may be attempting to, or receiving drugs and drug paraphernalia through institutional mail and distributing them to other individuals in custody. During the course of investigation interviews were conducted at which time three confidential sources (name and numbers have been withheld for the safety and security of the institution, but deemed reliable due to the consistency of their statements) identified Pedro Chairez Y35814 as being a source of distributing drugs, specifically methamphetamine throughout Menard Correctional Center.

(Doc. 1 at 63). The report was signed by a fellow-correctional officer as a "witness" and it was also signed by a shift supervisor and a reviewing officer, as well as a hearing investigator. The Adjustment Committee report described the situation and allegations consistent with the disciplinary report quote above. (Doc. 1 at 107-108). The committee indicated it found the "confidential source to be reliable based upon verification from internal affairs." (Doc. 1 at 107). Plaintiff received three months in c-grade and three months in segregation.[2]

The Court will adopt Plaintiff's designation of claims as follows:

**Claim 1:** **First Amendment retaliation claim against Defendants Reichert, Bohnert and Ottensmeier for their handling of Plaintiff's complaints about the conditions at Menard in September of 2023, and for subsequent disciplinary proceedings and administrative detention decisions;**

---

[2] Ultimately, during this three-month period when Plaintiff should have been on C-grade and in segregation, he was in administrative detention.

Claim 2: Fourteenth Amendment Due Process claim against Defendants Ottensmeier and Bohnert for the Notice that led to Plaintiff's placement in administrative detention, and against Defendants Armstrong and Loure for keeping Plaintiff in administrative detention without sufficient justification;

Claim 3: Fourteenth Amendment Due Process claim against Defendant Schoenbeck for convicting Plaintiff in December of 2023 without establishing the veracity of the confidential informants;

Claim 4: First Amendment claim against Defendant Ottensmeier for interfering with Plaintiff's incoming and outgoing mail exchanged with his wife;

Claim 5: First, Eighth, or Fourteenth Amendment claim against Defendants Ottensmeier, Bohnert and Reichert for implementing multiple restrictions on Plaintiff's ability to communicate with and visit with his wife.

The parties and the Court will use these designations in all future pleadings and orders unless otherwise directed by a judicial officer of this Court. Any claim that is mentioned in the Complaint but not addressed in this Order is considered dismissed without prejudice as inadequately pled under *Twombly*. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face").

DISCUSSION

## Claim 1

A prison official may not retaliate against an inmate because he filed grievances or a lawsuit under the First Amendment. *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020).

To show retaliation, an inmate must identify protected speech, a deprivation that occurred to deter the speech, and that the speech or protected activity was at least a motivating factor in the decision to take retaliatory action. Circumstantial evidence of a motivating factor or causal link may include suspicious timing or ambiguous statements, behavior, or comments, but suspicious timing alone is rarely enough to make out a retaliation claim. *Id.* at 680-81.

Here, Plaintiff alleges that after he began lodging complaints internally and externally about the conditions of confinement, Defendants Ottensmeier, Bohnert, and Reichert retaliated against him by coordinating his placement in restrictive housing, and later by placing him in administrative detention. The Court will assume at this preliminary stage of review that Plaintiff's complaints about the conditions of confinement were protected speech, and that statements he later made for administrative detention proceedings were also protected[3]. He contends that shortly after making complaints about his conditions of confinement, he was escorted to restrictive housing, and then a few weeks later he was subject to a cell shakedown that recovered alleged contraband for which he was disciplined more harshly than normal. He claims these instances were accompanied by verbal comments that suggested the actions were occurring because of his earlier complaints. He also claims in relation to administrative

---

[3] This second assumption is more tenuous than the first because Plaintiff admits that in the statement he prepared for the administrative detention hearing, he was extremely critical of internal affairs. Not all speech is protected, and depending on the precise nature of this speech it may or may not be protected.

detention review hearings that after he made statements critical of internal affairs, Ottensmeier then interfered further with his mail.

As to Defendants Reichert and Ottensmeier, Plaintiff has alleged just enough to proceed by indicating that in verbal exchanges both officials stated that they were taking certain actions because of Plaintiff causing problems for them by complaining. However, the Court notes that other than these statements, Plaintiff relies primarily on suspicious timing and speculation to establish a causal link between his protected activity and the allegedly retaliatory behavior. Later in the case, speculation and suspicious timing will not be sufficient to substantiate a retaliation claim without additional evidence.

By contrast, the Court will not allow Plaintiff to proceed on the retaliation claim against Bohnert because Plaintiff does not have any clear allegations that tie Bohnert to retaliatory behavior. There are no verbal interactions between the two, and he never indicates he interacted directly with Bohnert at all. At most, he alleges that Ottensmeier told him Bohnert participated in preparing the notice for administrative detention placement, but this participation alone does not establish retaliation. Thus, Claim 1 will be dismissed as insufficient against Bohnert.

## Claim 2

In Claim 2, Plaintiff challenges the due process he has been afforded for his administrative detention placement. In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court held that due process liberty interests prohibit restraints which impose an "atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life." *Id.* at 484. Although prison inmates do not have a constitutional right to remain in general

population, *see Lekas v. Briley*, 405 F.3d 602, 608–09 (7th Cir. 2005), in determining whether an atypical and significant hardship exists invoking due process, "both the duration and the conditions of the segregation must be considered." *Marion v. Columbia Correctional Inst.*, 559 F.3d 693, 698 (7th Cir. 2009). "[I]f the conditions of segregation were significantly harsher than those in the normal prison environment, then a year of [segregation] might count as a deprivation of liberty where a few days or even weeks might not." *Id.* (internal quotation omitted). The Seventh Circuit held in *Isby v. Brown*, 856 F.3d 508, 529 (7th Cir. 2017), that a period of ten years in segregation automatically constituted a deprivation of a liberty interest, which invoked a requirement for periodic review.

When a due process liberty interest is at stake, such as here, an inmate is entitled to "some informal, non-adversarial" procedures. *Westefer v. Neal*, 682 F.3d 679, 684–85 (7th Cir. 2012). Informal due process under these circumstances requires a periodic review of the placement determination at a frequency sufficient to ensure that "administrative segregation does not become 'a pretext for indefinite confinement.'" *Id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 477, n. 9 (1983)). The determination of the frequency of periodic review is committed to the discretion of prison officials. *Id.*; *see also Toussaint v. McCarthy*, 926 F.2d 800, 803 (9th Cir. 1990) (120 day interval satisfied due process). In sum, "the requirements of informal due process leave substantial discretion and flexibility in the hands of the prison administrators." *Westefer*, 682 F.3d at 685.

The *Isby* Court explained that the periodic reviews should be evaluated using the three factors from *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976). The factors are "(1) the private interest affected by a governmental decision, (2) the governmental interests at

stake, and (3) the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any of additional or substitute procedural safeguards." *Isby*, 856 F.3d at 525. The *Isby* Court concluded that reviews were inadequate because they frequently parroted old reasons to keep the plaintiff in segregation without considering his disciplinary history over time. *Id.; see also Kimble v. Boughton*, 2021 WL 3809904, at *18-19 (W.D. Wis. 2021) (finding that a warden who reviewed an inmate's administrative confinement status at regular intervals from 2017 to 2021, and justified ongoing confinement based past attack on guards, provided sufficient due process. Noted consultation with a medical professional during the ongoing confinement).

Here, Plaintiff attacks both his initial placement in administrative segregation, and the sufficiency of his ongoing placement reviews, which occur approximately every 90 days. He claims Defendants lacked sufficient initial support for his placement, and that they have conducted sham follow-up reviews that simply regurgitate the original reasons for his placement. Plaintiff has now been in administrative segregation for about 13 months. He describes the conditions as total isolation behind a solid metal door, with few opportunities for recreation or even showers. The Court accepts at this preliminary juncture that the conditions of administrative detention Plaintiff has experienced for the last 13 months are likely atypical and significant deprivations relative to ordinary prison life, or even life in standard disciplinary segregation. The question then becomes the adequacy of the procedures that led to the placement, as well as the adequacy of the ongoing reviews. These determinations will likely be factually complex. At this

preliminary juncture, the Court will read Plaintiff's complaint broadly in his favor, accepting his assertions that some of the information contained in the initial disciplinary notice may have been dated or mis portrayed, and that subsequent reviews have been cursory.  This is enough for Plaintiff to proceed against Defendants Bohnert and Ottensmeier (who initiated the placement) and Defendants Armstrong and Loure (who continue to approve the placement in 90-day intervals) related to Plaintiff's ongoing administrative segregation.

## Claim 3

Plaintiff also challenges the due process he was afforded for the December 2023 disciplinary proceedings.  Specifically, he attacks the use of confidential informants without adequate assurances of their reliability.  To establish a due process claim related to disciplinary proceedings, an inmate must demonstrate: (1) the deprivation of a liberty interest; and (2) the procedures he was afforded were constitutionally deficient.  *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019).  Six months in segregation and six months' loss or restriction of privileges—do not, without more, implicate a protected liberty interest. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013) (six-month disciplinary segregation alone); *Lekas v. Briley*, 405 F.3d 602, 605, 613 (7th Cir. 2005) (temporary loss of contact visitation and restricted commissary); *Whitford v. Boglino*, 63 F.3d 527, 533 n.7 (7th Cir. 1995) (six-month disciplinary segregation and demotion to C grade).  A plaintiff may also argue that the combination of disciplinary measures deprived him of a protected liberty interest.  *See Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015).  There is no bright-line rule for the duration or conditions of segregation that might invoke a protected

liberty interest, but generally a term of segregation approaching or exceeding a year may be considered significant enough to invoke due process protections.  *See e.g.*, *Marion v. Columbia Correction Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (finding that a term of 240-days of segregation was long enough to mandate an inquiry into the conditions of the confinement).  However, the imposition of disciplinary segregation without "additional facts about the conditions of confinement, [does] not implicate a liberty interest." *Miller v. Maue*, 759 F. App'x 515, 516 (7th Cir. 2019).  Additionally, in a situation where an inmate complains of discipline such as segregation, or anything other than the loss of good-time credit, the disciplinary proceedings are subject to an informal due process inquiry.  Informal due process requires only that an inmate is provided (1) notice of the reasons for his placement in segregation, (2) and an opportunity to present his views in a written statement or hearing.  *Ealy v. Watson*, 109 F.4th 958, 965 (7th Cir. 2024).

Here, Plaintiff argues that he has now been in administrative detention for more than a year as a result of the December 2023 discipline, but the direct consequence of the discipline was 3 months of segregation and C-grade.  There is a separate analysis for the process afforded in relation to administrative detention placement, and the Court has already discussed that analysis in relation to Claim 2.  Limiting Claim 3 just to the consequences that were assessed directly via the disciplinary ticket—Plaintiff needed to receive notice of the reasons for his placement in segregation, and an opportunity to present his views.  He does not contest that he received these things.  What he challenges is Defendant Schoenbeck's reliance on confidential informants, whose veracity he did not

personally verify. In the Seventh Circuit's recent Ealy decision, three confidential

informants provided a factual basis for the discipline, and plaintiff served a year in

segregation, but the Seventh Circuit found that the hearing satisfied informal due process

without a detailed analysis of the veracity of the informants' statements. It is not entirely

clear from precedent if a more probing analysis is needed in the context of informal due

process.

*Mendoza v. Miller* provides the framework for analyzing the use of confidential

informants in prison disciplinary proceedings. 779 F.2d 1297 (7th Cir. 1985). *Mendoza*

provides:

> To protect the inmate's interest in a fair hearing, our court requires some
> indication of the reliability of confidential informants when confidential
> information is the basis for a prison disciplinary decision. *Dawson v. Smith,*
> 719 F.2d 896, 899 (7th Cir.1983). The reliability of confidential informants
> may be established by: (1) the oath of the investigating officer as to the truth
> of his report containing confidential information and his appearance before
> the disciplinary committee, *McCollum,* 695 F.2d at 1049; (2) corroborating
> testimony, *Jackson,* 707 F.2d at 948; (3) a statement on the record by the
> chairman of the disciplinary committee that, "he had firsthand knowledge
> of the sources of information and considered them reliable on the basis of
> 'their past record of reliability,'" *Id. at 948*; or (4) in camera review of
> material documenting the investigator's assessment of the credibility of the
> confidential informant. *Dawson,* 719 F.2d at 899.

*Id.* at 1293.

Plaintiff argues in this case that the *Mendoza* standards were not met because when

he confronted Schoenbeck about his knowledge of the confidential informants' evidence,

Schoenbeck indicated he had not verified their information. Despite Schoenbeck's

alleged lack of personal knowledge at the time of the hearing, the final report indicates

that the confidential source information was verified for the Adjustment Committee by

internal affairs, and that it was found to be reliable based on the consistency of statements among three informants.  (Doc. 1 at 107).  The existence of corroborating testimony amongst the informants satisfies the *Mendoza* factors, so the Court finds that Plaintiff's allegations here are insufficient to establish a due process violation by Defendant Schoenbeck related to the December disciplinary proceedings.

### Claims 4 and 5

Inmates have a right to send and receive mail and "a continuing pattern or repeated occurrences" of improperly rejecting mail may state a First Amendment violation.  *See Zimmerman v. Tribble*, 226 F.3d 568, 572 (7th Cir. 2000) ("First Amendment applies to communications between an inmate and an outsider").  Prison regulations or practices affecting a prisoner's receipt of non-legal mail also implicate First Amendment rights and must be "reasonably related to legitimate penological interests." *Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999).  Prison security can be a legitimate justification for practices concerning non-legal mail. *See e.g., Gaines v. Lane*, 790 F.2d 1299, 1304 (7th Cir. 1986).

In Claim 4, Plaintiff faults Defendant Ottensmeier for repeatedly interfering with mail he attempted to exchange with his wife.  He claims Ottensmeier severely delayed incoming and outgoing mail, and totally prevented the delivery of a significant quantity of mail.  These allegations are sufficient at this juncture to proceed on Claim 4 against Defendant Ottensmeier.

Claim 5 is broader because it deals with electronic communications via tablet, phone calls, and visits (both in-person and video).  Prisoners have no independent

constitutional right to visitation or to particular forms of visitation, and prison officials have considerable discretion in determining the time, place, duration and conditions of visitation. *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989). Indeed "[s]ome curtailment of that freedom must be expected in the prison context." *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003). At the same time, prison officials may violate the constitution "by permanently or arbitrarily denying an inmate visits with family members." *Easterling v. Thurmer*, 880 F.3d 319, 323 (7th Cir. 2018). Here, Plaintiff alleges his visits have essentially been permanently or arbitrarily denied, although the rationale initially given was prison security. For now, he may proceed on this claim.

As for the telephone communications, tablet messaging and video visits, the Court does not find at this juncture that these additional restrictions violate Plaintiff's rights because none of these forms of communication are guaranteed by the constitution. *See e.g., Gatch v. Walton*, 2013 WL 6405831 at *2-3 (S.D. Ill. 2013) (finding that phone restrictions are routinely upheld, and electronic communication restrictions did not violate the constitution where the inmate had other forms of communication).

In sum, Claim 4 may proceed against Defendant Ottensmeier, and Claim 5 may proceed against Defendants Reichert, Bohnert and Ottensmeier limited to the issue of in-person visitation privileges.

## **Injunctive Relief**

At the end of the complaint, Plaintiff seeks numerous forms of immediate injunctive relief tailored to the issues he has identified in the lawsuit. His demands include release from administrative detention, transfer to another facility, restoration of

all forms of communication with his wife, and more.  Federal Rule of Civil Procedure 65 governs motions for temporary restraining orders or preliminary injunctions, but Plaintiff did not cite this provision and did not file a freestanding motion demanding injunctive relief.  Even if Plaintiff had filed a freestanding motion, on the facts alleged it is unlikely Plaintiff would be able to seek preliminary injunctive relief of the forms he seeks because the issues presented in this case are closely intertwined with prison security and daily operations, and the standard of proof for each of his claims is factually and legally demanding.  One key factor when assessing preliminary injunctive relief is the likelihood of success on the merits of the underlying claim.

"A movant's likelihood of success on the merits must be strong." *Tully v. Okeson*, 977 F.3d 608, 613 (7th Cir. 2020).  A strong showing typically entails a demonstration of how the applicant intends to prove key elements of his case.  *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020); *Doe v. University of Southern Indiana*, 43 F.4th 784, 791-92 (7th Cir. 2022) (the court is not required to make inferences in the movant's favor when considering preliminary injunctive relief).  Here, Plaintiff has made a sufficient showing to proceed beyond initial review on his claims, but his allegations are not sufficiently strong at this early juncture to warrant immediate injunctive relief. Therefore, the Court will not award any immediate relief based on the demand for relief in the complaint.

## Disposition

**IT IS HEREBY ORDERED THAT Claim 1** of the Complaint (Doc. 1) survives initial screening as described above against Defendants Ottensmeier and Reichert; Claim

2 may proceed against Ottensmeier, Bohnert, Armstrong, and Loure, Claim 4 may proceed against Ottensmeier, and Claim 5 may proceed against Defendants Ottensmeier, Reichert and Bohnert.  By contrast, Claim 3 is insufficient against Defendant Schoenbeck, and the Clerk of Court is **DIRECTED** to **TERMINATE** Defendant Schoenbeck.  The Clerk of Court is **DIRECTED** to also **ADD** the Warden of Menard in official capacity, because the Warden would be the proper party to implement injunctive relief if any is awarded at the end of the case.

The Clerk of Court is **DIRECTED** to prepare for Defendants Ottensmeier, Bohnert, Reichert, Armstrong, Loure, and the Warden of Menard (official capacity only for future injunctive relief): (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons).  The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint (Doc. 1), and this Memorandum and Order to Defendants' place of employment as identified by Plaintiff.  If Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on Defendant, and the Court will require Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address.  This information shall be used only for sending the forms as directed above or for formally effecting service.  Any documentation

of the address shall be retained only by the Clerk.  Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). **Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merits Review Order.  However, the Warden need not file an answer because he or she has been added solely because Plaintiff seeks eventual injunctive relief.**

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under Section 1915, Plaintiff will be required to pay the full amount of the costs, regardless of whether his application to proceed *in forma pauperis* was granted.  *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that he is under a continuing obligation to inform the Clerk of Court and each opposing party of any address changes; the Court will not independently investigate his whereabouts.  This shall be done in writing and not later than 7 days after a transfer or other change of address occurs.  Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for failure to prosecute.  Fed. R. Civ. P. 41(b).

**IT IS SO ORDERED.**

Dated: January 23, 2025

/s *David W. Dugan*

_____
DAVID W. DUGAN
United States District Judge

### Notice to Plaintiff

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least 60 days from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take 90 days or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.

The Court wishes to remind the Plaintiff that litigation is often viewed a series of hurdles that the Plaintiff must clear to get to another hurdle. Initial screening is such a hurdle, but it is a very low one for the Plaintiff to clear.  As noted above, surviving initial screening only requires the bare statement of a claim that, if proven, could entitle Plaintiff to some relief. At trial, he will need to prove by a preponderance of evidence that the facts alleged actually occurred and that those facts satisfy the legal requirements for recovery. Trial is the highest and most difficult of hurdles for any Plaintiff to clear.